187 So.2d 294

Michael Charles SHERIDAN

v.

STATE.

1 Div. 81, 82.

Court of Appeals of Alabama.

May 31, 1966.

Barry Hess, Mobile, for appellant.

Richmond M. Flowers, Atty. Gen., and Paul T. Gish, Jr., Asst. Atty. Gen., for the State.

CATES, Judge.

These appeals were submitted November 9, 1965, after the appellant's motion to consolidate.

We here review judgments of conviction (1) of the felony of possessing a drug defined by Code 1940, T. 22, § 225, as amended (with reference to § 242), as "a narcotic drug," and (2) of the misdemeanor denounced by T. 14, § 175, as amended, carrying an unlicensed pistol in a vehicle.

For the felony conviction, the trial judge sentenced Sheridan to five years in the penitentiary; and, on the pistol charge,

prescribed six months imprisonment in the county jail in addition to the fine of $100.00 levied by the jury.

## I.

Both charges arose from a roadside arrest made December 16, 1963, on U. S. Highway 90 just east of Grand Bay in Mobile County.

Sheridan, who had driven from New Orleans, had pulled over into a rest area on the right-of-way off the paved roadway. The highway authorities had posted at the entry of the area a notice prohibiting "overnight" parking.

The light of State Trooper Louis Woods's flashlight woke Sheridan up about one o'clock in the morning. Woods's scrutiny with the torch beam showed a 22 automatic pistol lying "on the front seat about where Mr. Sheridan's head would have been when he was asleep."

Woods and his partner took the pistol and radioed to the Sheriff's office. In a few minutes two deputies came.

Woods gave Sheridan's pistol to L. P. Driggers, detective with the Mobile County Sheriff's office. Driggers asked Sheridan if he had a permit for the gun.

Receiving a negative reply, Driggers informed Sheridan of the obvious,[1] that he was under arrest, and then proceeded to search Sheridan's person.

### A.

#### The First Search

Sheridan was standing beside his car. Driggers searched his clothes and person. The two highway patrolmen stood behind Driggers.

Driggers found "a small vial containing some pills, tablets." Driggers did not know

---

1. The Highway Patrolmen had effectively restrained Sheridan's power of locomotion. That they failed to take him before a committing magistrate seems, in view of the prompt appearance of the deputies, not violative of Sheridan's rights.

of what the pills (or tablets) were compounded.

Driggers turned the vial (along with the fruits of searches two—glove compartment, and three—car trunk) over to Nelson Grubbs, a toxicologist for the State.

### B.

#### Search Two (Car's Glove Compartment)

At the same place, the roadside rest area, Driggers found "some more pills that were * * * scattered around in the glove compartment."

These pills Driggers also gave to Grubbs.

### C.

#### Search Three (Car Trunk)

After the arrest and searches of Sheridan's person and glove compartment, the entire party went to Mobile.

Driggers took Sheridan along with him in the Sheriff's car and another officer drove Sheridan's car to Mobile and parked it in front of the booking room of the Sheriff's office.

Apparently the deputy kept the keys. Driggers, on cross-examination, agreed that the car was at all times in the Sheriff's custody.

Thereafter, without the benefit of a warrant, the deputies searched the trunk and found various and sundry pills.

### D.

#### Toxicologist's Testimony

Nelson Grubbs, a toxicologist for the State, received the various pills and liquid from Driggers and made a chemical analysis of them.

He gave the opinion that the liquid was ethyl alcohol, whether adulterated or not does not appear.

Some of the pills were in a square bottle containing two pink and white tablets which he testified were methocarbamol and acetylsalicylic acid—not a narcotic drug nor a barbiturate.

Most of the other pills and tablets were identified by Grubbs as being "narcotics," mostly containing salts of barbital.

Nowhere in Grubbs's testimony is it possible to isolate the source from which Driggers obtained the contraband narcotic drugs nor whence came the nonnarcotic drugs. This omission put the trial court in error for overruling the defendant's motion to exclude the evidence.

### II.

We consider that the search of the defendant at the roadside park was lawful. The pistol lay in the car exposed to plain view, though the lack of daylight required the officer to use a flashlight.

This discovery alone justified the detention and arrest of Sheridan. The pistol was not the fruit of a search because a search is a forcible seeking out, a probing, in hidden places. Kelley v. State, 39 Ala. App. 572, 105 So.2d 687; Thompson v. State, 41 Ala.App. 353, 132 So.2d 386.

As a consequence of the arrest for the possession of the pistol in the car, it was necessary and proper for the officers to search the person of Sheridan for: (a) weapons; (b) to take evidence; and (c) to preclude his escape or of his destroying evidence. See Preston v. United States, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777. No warrant for this first search was needed in these circumstances, since the highway patrolmen had observed the commission of a public offense in their presence.[2]

The fact that the troopers chose to wait for the Sheriff's deputies rather than abandon their primary duty of patrolling

---

2. Code 1940, T. 15, § 154: "An officer may also arrest any person, without warrant, on any day and at any time, for any public offense committed, or a breach of the peace threatened in his presence; * * *"

the roads, should not work to the disadvantage of the State for two reasons: First, the deputies arrived in a short time; and, second, the record fails to reveal any oppressive conduct on the part of the highway patrolmen while they detained Sheridan for delivery to the deputies. We do consider that the arrest was made, in law, by the highway patrolmen, since, by very definition, an arrest is an officer's deprivation of another's freedom of locomotion to bring him to book. Code 1940, T. 15, §§ 155 and 160.

■ As to the search of the glove compartment without a warrant, since there was objection to the evidence thereof, we consider this to be an illegal search and seizure requiring the operation of the exclusionary rule of Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081. Knox v. State, 42 Ala.App. 578, 172 So.2d 787.

■ The rule as to the need inherent in the nature of vehicles (because they can be taken off while the officer goes for a warrant) under Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543, does not bear on the instant facts. Neither Sheridan nor any possible confederate was shown to have any likelihood of spiriting his car away.

· The opening of the car trunk at the Sheriff's office is squarely within the factual situation which led to reversal in York v. State, 43 Ala.App. 54, 179 So.2d 330.

### III.

We are now confronted in this situation, as to the extent of the "fruit of the poisonous tree" doctrine. Following this analogy, we perceive that the State has put all of its apples in one basket: failing to separate the various pieces of evidence as to whence they were plucked.

In Duncan v. State, 278 Ala. 145, 176 So. 2d 840 (hn. 32, 33), Mr. Justice Lawson took note of Fahy v. State of Connecticut, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171, and a number of other Federal decisions. He there concluded that the rule did not extend to a situation where the evidence was obtained independently so as to be sufficiently distinguishable from evidence discovered only by illegal methods.

The court dealt with the problem of a confession consequent upon, among other things, the confrontation of the witness with objects taken in an illegal search. We do not consider that the *Duncan* case relies upon the "fruit of the poisonous tree" doctrine as one of its ratio decidendi.

Certainly here the two illegal searches produced substantial fruit.

In Fahy v. State of Connecticut, supra, the court framed the issue:

"The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction."

We are unable to detect the good apples from the bad apples. Accordingly, we think that the interest of justice requires, under our doctrine of harmless error as it now stands, that the separation of the evidence be taken up at another trial.

■ Accordingly, on the authority of the cases listed in *Duncan,* supra, under the discussion therein of the "fruit of the poisonous tree" doctrine, we find it necessary to reverse and remand the judgment in 1 Div. 82.

### IV.

■ As to 1 Div. 81, we consider there was sufficient evidence to support the judgment of conviction of the possession of the pistol, contrary to the statutes in such cases made and provided. That judgment will stand affirmed.

Judgment in 1 Div. 81 (carrying pistol)

Affirmed.

Judgment in 1 Div. 82 (possession of narcotics)

Reversed and remanded.